Filed 5/2/25  P. v. Sanchez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELIJAH JENE SANCHEZ,<br><br>Defendant and Appellant. | F086713<br><br>(Super. Ct. No. SF021118A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich and Kenneth C. Twisselman II, Judges.†

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs, Ivan P. Marrs, and Jennifer M. Poe, Deputy Attorneys General for Plaintiff and Respondent.

-ooOoo-

---

†       Judge Dulcich presided over the May 16, 2023, *Marsden* hearing.  Judge Twisselman presided over the July 3, 2023, *Marsden* hearing and the sentencing hearing.

## INTRODUCTION

A jury convicted Elijah Jene Sanchez (appellant) of willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a); count 1),[1] assault with a semiautomatic firearm (§ 245, subd. (b); count 2) and carrying a loaded and unregistered firearm (§ 25850, subds. (a), (c)(6); count 3). As to count 1, the jury found true the enhancement for intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). As to count 2, the jury found true enhancements for personal use of a firearm (§ 12022.5, subd. (a)) and personal infliction of great bodily injury (§ 12022.7, subd. (a)). In a bifurcated phase of the trial, the jury found true the allegation that appellant committed count 3 for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) However, the jury was unable to reach a verdict as to the gang allegations on counts 1 and 2.[2] The trial court sentenced appellant to 32 years to life in state prison.

Appellant raises three claims on appeal. First, he contends the trial court erred in denying his motion to replace appointed counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. Next, he argues the jury's true finding as to the gang allegation on count 3 was not supported by substantial evidence. Finally, he alleges the court was unaware of its discretion under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*) to impose a lesser, uncharged firearm enhancement on count 1. We conclude denial of the *Marsden* motion was not an abuse of discretion, the count 3 gang allegation was supported by substantial evidence, and appellant was properly sentenced. We affirm.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     The gang allegations were tried separately pursuant to section 1109, subdivision (a).

BACKGROUND

## I. Trial Phase One – Substantive Offenses and Nongang Related Enhancements.

### A. *Testimony of Javier Munoz.*

On the morning of February 9, 2023, Javier Munoz went to court in the City of Shafter for a child custody hearing. He left the courthouse around 9:00 a.m. with the mother of his child, Mariana Ortega. They walked toward Ortega's residence, which was located behind a fast-food restaurant. As they began to walk across a street toward the restaurant, Munoz saw appellant standing near the restaurant parking lot. Appellant was giving Munoz a "hard stare" and saying something, but Munoz could not make it out. Munoz had never seen appellant before.

Munoz testified that when he got closer to appellant, he heard him say, " 'What's up?' " and " 'Don't get close to me.' " Munoz asked appellant what was going on and if he was " 'having a bad day.' " Appellant raised both of his arms in the air and said, "Bakers." Munoz interpreted this as appellant trying to "bang on" him. He described "banging" as claiming where one is from, "act[ing] hard," and challenging another to a fight. Munoz admitted he is a former member of the Varrio Westside Shafter criminal street gang (VWS), and he has several prominent gang tattoos.

Munoz continued to approach appellant, and said, " 'The way you want to bang, what's going on?' " Appellant lifted his shirt revealing a handgun in his waistband. Munoz asked appellant why he brought out a gun, and appellant continued to yell at him. Munoz told appellant, " 'Let's fight better. Go in the alley, get it over with. You want to act hard, want to gangbang, let's go in the alley and get it over with.' " He explained he did not want to fight appellant but preferred to fight without weapons. Munoz was unarmed.

Appellant moved toward Munoz, and Munoz backed away. Appellant drew the handgun and Munoz began to run. He glanced back and saw appellant was chasing him with the gun pointed at him. Appellant began shooting. Munoz tripped and fell in the

street, and appellant approached him fired more shots. A bullet struck Munoz in the head.

After the shooting, appellant fled on foot. Munoz was treated by emergency personnel and transported to the hospital. No weapons were found on Munoz's person. There were six expended cartridge casings on the ground.

Munoz had two apparent gunshot wounds to the side of his head – one above his left ear, and another near his left eyebrow. It is unclear whether the injuries were caused by one bullet that entered and exited, or by two different bullets. He still has bullet fragments in his head that cannot be removed. He still suffers from seizures and is unable to work.

### B.      *Videos of the shooting.*

The prosecution admitted two videos of the shooting that appear to have been recorded by bystanders with cell phone cameras. The videos show Munoz approach appellant in the fast-food restaurant parking lot with his arms raised. Appellant backs away from Munoz through the parking lot, and they remain over one car length apart. Appellant then moves quickly toward Munoz, who turns and runs toward the street. Appellant points a handgun at Munoz and fires. Munoz stumbles when he reaches the middle of the street. Appellant continues to pursue Munoz and fires two additional shots from close range. Munoz falls to the ground. Appellant stands next to Munoz, aims down at him, and fires another shot. At this point in the recordings, the bystanders appear to lower their cell phones, and the cameras do not capture the remainder of the shooting. However, two additional gunshots can be heard.

### C.      *An officer observes the shooting and arrests appellant.*

At the time of the shooting, an on-duty police officer was parked in a parking lot east of the fast-food restaurant. He testified he heard three gunshots, then moved his patrol vehicle to look down the street in the direction of the shots. He observed appellant chasing Munoz toward the middle of the street.

4.

Appellant then raised a firearm and fired three shots at Munoz from close range, and Munoz fell to the ground. The officer estimated he was approximately 100 yards from the shooting.

Appellant fled on foot through the yard of a nearby residence. The officer positioned himself at the entrance of an alley that runs behind the residence and began to set up a perimeter. Two minutes later, appellant exited the alley and stated, " 'I'm the one you're looking for. I did it.' "

Appellant was placed under arrest. While being transported to the police station, appellant pointed toward the residences adjacent to the alley and said, " 'That's where the gun is.' " An officer later found a handgun in the yard of one of the residences. It had no registered owner.

Appellant was interviewed at the police station. He admitted he used a black handgun and fired six shots at Munoz before the gun jammed. He never stated he acted out of fear or claimed Munoz had a weapon. At one point, appellant asked the interviewing officer, "Did I hit him?" He also asked if Munoz was in the hospital, and stated, " 'At least make it worth it.' " While the officer was photographing appellant, he stated he "couldn't fight the case even if he wanted to," because he "got caught with his hand in the cookie jar in broad daylight."

The interviewing officer left to see Munoz at the hospital, then returned and interviewed appellant again. During the second interview, appellant claimed he acted in self-defense and told the officer to "check the cameras." The officer asked appellant why he shot Munoz. Appellant stated Munoz was not "normal." He made a circular motion around his face with his index finger and pointed at his eyes, then did the same to Munoz's face and eyes. The officer interpreted this to mean that they locked eyes and saw each other's tattoos. Appellant has a large tattoo on his face.

Appellant stated he did not know Munoz. When the officer asked appellant again why he shot Munoz, appellant stated, " 'At the end of the day, I didn't have to do what I did, but I did.' "

#### D. *Testimony of a café employee.*

An employee at a café across the street from the fast-food restaurant testified another employee told her that people were fighting outside. She looked out of the drive thru window and saw appellant and Munoz near the fast-food restaurant yelling back and forth. Munoz began walking toward appellant with his arms raised, and appellant backed away. She described Munoz as "instigating," but specified he never got closer than 10 feet from appellant. She could not hear what they were saying.

Munoz began backing away from appellant, then turned and started to run. Appellant had a gun and was shooting at Munoz. She heard several gunshots. She told the other employees to get down and called the police.

#### E. *Defense evidence.*

Natalie Morales, appellant's ex-girlfriend, testified she was walking with appellant to a health clinic on the morning of the shooting. She saw Munoz and Ortega walking across the street. Munoz approached appellant and said, " 'What'd you say, my boy? You tripping.' " Appellant had not said anything to Munoz. Appellant told Morales that they should go back to her home, and they tried to walk away. Munoz followed them and kept shouting. Eventually, Munoz ran toward them and lifted his shirt, leading her to believe he had a gun. She turned around, then heard gunshots. When she looked back, Munoz was on the ground, and appellant had a gun in his hand. She did not see appellant pull out the gun or show it to Munoz.

Two additional employees from the café testified they saw appellant and Munoz arguing outside of the fast-food restaurant. They both saw Munoz walk toward appellant, and appellant back away. Appellant then drew a gun, moved toward Munoz, and started shooting.

## II. Trial Phase Two – Gang Allegations.

### A. *Prosecution evidence.*

The prosecution gang expert testified appellant was an active member of the Eastside Bakers criminal street gang (EB). The EB gang falls under the umbrella of Sureño gangs and claims territory on the east side of the City of Bakersfield. Its primary activities include murder, attempted murder, assault with a firearm, robbery, carjacking, theft, narcotic sales, and unlawful possession of firearms. Evidence was presented that members of the EB gang had committed three predicate offenses, and the expert opined the predicates were committed for the common benefit of the gang.

Appellant has numerous gang related tattoos covering much of his body. Notably, he has the letters "E" and "B" on his upper arms, which stands for Eastside Bakers. He also has "KC" in large block letters on the right side of his face, which is used by Sureño members within Kern County, and the numbers "1" and "3" on his hands and three small dots near his left eye, which relates to the Sureños.

In 2019, officers searched the residence of another EB gang member and discovered a handwritten letter from appellant. In the letter, appellant states he is incarcerated at the Youth Authority with other "Bakers," which refers to Sureños from other Bakersfield gangs. He explains that they have been getting in fights with Norteños, and that he plans to get additional gang tattoos. Appellant also states that when he gets out of custody, he is going to " 'get all the lil homies on the same page and get organized,' " and " 'make our presence known.' "

The prosecution gang expert explained the EB gang rivals with Norteño gangs and other Sureño gangs. The VWS gang, Munoz's former gang, is also a Sureño gang. The gang expert testified he is unaware of a rivalry between the EB gang and the VWS gang, but noted he works in Bakersfield and does not often deal with Shafter gangs. However, he explained that it is common for Sureño gangs to attack other Sureño gangs if they do

not have an alliance. Representing one's gang to a nonaligned gang member is seen as an act of disrespect.

EB gang members regularly travel outside of their territorial boundaries to engage in crimes against rivals, whether actual or perceived. They are expected to attack rival gang members whenever they see them and will face discipline if they do not act. They may perceive a person to be a rival gang member based on the tattoos they are displaying or the colors they are wearing.

The prosecution gang expert testified that "banging" is the act of representing one's gang. It is a "challenge" and a disrespectful way to acknowledge another person. It is typically done to actual or perceived rival gang members. "Banging" often involves putting up gang signs or saying the name of their gang.

The prosecution gang expert opined that several aspects of the shooting indicate it was gang related. Appellant was an EB gang member in VWS gang territory. He approached a former VWS gang member and "banged" on him by calling out the name of his own gang and displaying a firearm. Moreover, during his law enforcement interview, appellant pointed at his face, which features prominent gang tattoos, and Munoz's face, which also has tattoos. The gang expert understood this to mean that appellant shot Munoz because he perceived him to be a rival.

Based on a hypothetical question mirroring the evidence at trial, the gang expert opined that appellant committed the charged offenses for the benefit of the EB gang. Killing a rival gang member benefits the EB gang because it makes the rival gang smaller and weaker. Shooting at a rival gang member also instills fear in the rival gang and shows EB gang members are not afraid to shoot and kill for their gang. Conversely, if an EB gang member "bangs on" another gang member but does not follow up with an act of violence, the EB gang will appear weak to other gangs.

With respect to firearm possession, the gang expert explained that a firearm is the "most powerful tool for a gang member." It gives a gang member the ability to commit

violent acts against rival gang members, and to commit other violent crimes, such as robbery and carjacking. In the instant case, the firearm allowed appellant to commit the violent assault on a perceived rival gang member. A firearm also eliminates the threat of being overpowered by a larger opponent in a physical fight. Thus, firearm possession provides a defensive benefit, deters attacks by rival gang members, and opens a wider range of potential targets.

### B. *Defense evidence.*

A gang expert called by the defense opined that the charged offenses were not committed for the benefit of the EB gang. He contended appellant did not represent to Munoz that he was a member of the EB gang, because his visible tattoos, such as the "KC" on his face, are not gang specific. Additionally, the word "Bakers" could have been interpreted as a reference to several other Bakersfield gangs, such as the Okie Baker gang or the Colonia Baker gang. The defense gang expert also observed there was no evidence of an ongoing conflict between the EB gang and the VWS gang. Finally, he concluded the evidence showed Munoz was the initial aggressor, which was inconsistent with appellant having targeted a perceived rival gang member.

## DISCUSSION

### I. The Trial Court's Denial of Appellant's *Marsden* Motion Was Not an Abuse of Discretion.

Appellant made a *Marsden* motion at two different points in the proceedings. In the first motion, made approximately three weeks before trial, appellant complained he was unable to exercise his right to a speedy trial due to defense counsel's unavailability. In the second motion, made just prior to the bifurcated phase of the trial on the gang allegations, appellant claimed that defense counsel did not communicate with him and refused to call witnesses that would have supported his defense. The trial court denied both motions.

9.

Appellant contends the denial of the second *Marsden* motion was an abuse of discretion because the trial court did not adequately consider whether his relationship with defense counsel had deteriorated into an irreconcilable conflict. Appellant does not challenge the court's express finding that defense counsel provided competent representation during the first phase of the trial. However, he argues his own subjective belief that defense counsel had not presented a complete defense, combined with defense counsel's alleged failure to communicate with him, caused such a breakdown in their relationship that defense counsel was unable to provide adequate representation.

## A. *Background.*

### 1. The *Marsden* hearing on May 16, 2023.

Appellant's first *Marsden* hearing occurred approximately three weeks before trial. During the hearing, appellant stated he wanted to proceed to trial as soon as possible, but his matter had been continued due to defense counsel's unavailability. Appellant also complained defense counsel was not communicating with him or updating him on the status of his case.

Defense counsel responded he was ready for trial, but he was also ready on four other murder cases and did not have control over which would proceed to trial first. Defense counsel also explained he had discussed the case and defense strategy with appellant, and he had met with two of appellant's friends in his office to review the evidence.

The trial court found defense counsel was competently representing appellant and denied the motion. It observed appellant and defense counsel appeared to be on the "same page" about getting the case to trial, but the delays were outside of defense counsel's control.

### 2. The *Marsden* hearing on July 3, 2023.

Appellant's second *Marsden* hearing occurred the morning before the start of the bifurcated phase of the trial on the gang allegations. At this point in the trial, the jury had

10.

already returned guilty verdicts on the substantive offenses and true findings on the nongang related enhancement allegations.

During the hearing, appellant made numerous complaints about defense counsel's performance. He stated he gave defense counsel a list of nine witnesses to call at trial, but defense counsel only called two. He alleged defense counsel never communicated with him during trial, visited him in jail, or asked for his side of the story. He claimed defense counsel should have objected when Munoz testified appellant was "banging" on him, and that defense counsel was doing crossword puzzles during closing argument. Lastly, appellant argued defense counsel should have obtained Munoz's medical records and called an expert to show that Munoz's injuries were not caused by a gunshot.

The trial court questioned appellant about each of the potential witnesses defense counsel did not call at trial and asked appellant what he believed their testimony would have shown. The witnesses included several uninvolved parties who witnessed the shooting, as well as Ortega, the mother of Munoz's child who was walking with him when the confrontation occurred. According to appellant, these witnesses would have testified Munoz was the initial aggressor, appellant did not act with the intent to kill, and the conflict was not gang related.

Defense counsel explained in detail why he did not call each of the witnesses. Two of the witnesses would have testified appellant "went too far," which would have undermined appellant's self-defense claim. Another witness provided phony contact information and could not be located. Ortega would have testified appellant "was the first to yell out," which would not have assisted appellant. The remaining witnesses would have provided duplicative testimony.

Defense counsel also denied appellant's assertion that he had not communicated with him. He stated he had conferred with appellant "all along," including every day in trial. Responding to the trial court's inquiry, defense counsel agreed he gave appellant

11.

every opportunity to tell him what he wanted to say about the case. Defense counsel noted, however, that appellant argues with him "on everything."

The trial court denied the *Marsden* motion as follows:

> "I don't find that Mr. Turnbull has failed to adequately represent [appellant]. I appreciate that [appellant] has strong feelings about the conviction and that the jury did not find that it was self-defense. The D.A. had the burden of proof that it was not self-defense beyond a reasonable doubt and he was able to persuade the jury of that. I think [defense counsel] did a competent job in representing the defendant during the trial. I find he did a competent job in arguing the self-defense and it's just one of those things, you don't always get the jury verdict that you're hoping for. I appreciate [appellant's] strong feelings, but I'm going to deny the Marsden motion."

**B.      *Standard of review.***

" 'A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' [Citation.] When the defendant seeks to remove appointed counsel 'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of counsel's inadequacy.' " (*People v. Panah* (2005) 35 Cal.4th 395, 431.) A defendant "must give specific examples of counsel's inadequacies, and cannot rest upon mere failure to get along with or have confidence in counsel." (*People v. Bills* (1995) 38 Cal.App.4th 953, 961.)

The denial of a *Marsden* motion is reviewed for an abuse of discretion. (*People v. Streeter* (2012) 54 Cal.4th 205, 230.) "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.)

**C.** *An abuse of discretion did not occur.*

Based on our review of the record, we conclude the trial court's denial of appellant's second *Marsden* motion was not an abuse of discretion. The court's determination that defense counsel provided competent representation was reasonable. During the first phase of the trial, defense counsel pursued the same defense strategy discussed by appellant in the *Marsden* hearing – that he acted in self-defense, and did not act with the intent to kill. Defense counsel called witnesses in appellant's defense to support these defense theories, thoroughly cross-examined prosecution witnesses, and raised appropriate objections. Having observed defense counsel throughout the first phase of the trial, the court could "properly comment on the quality of his performance." (*People v. Hines* (1997) 15 Cal.4th 997, 1026.) The record comports with the court's finding.

Appellant's complaints primarily concerned defense counsel's decision whether to call certain witnesses. Such tactical disagreements are insufficient to compel discharge of appointed counsel. (*People v. Rodriguez* (2014) 58 Cal.4th 587, 624; *People v. Cole* (2004) 33 Cal.4th 1158, 1192.) Nonetheless, the trial court allowed appellant to explain why each witness was critical to his defense. In response, defense counsel explained that he decided not to call the witnesses because their testimony was either unhelpful or duplicative, or they could not be located. These explanations were reasonable and supported the court's finding that defense counsel had provided effective representation.

Appellant contends that even if defense counsel's performance was adequate, the *Marsden* motion should still have been granted because appellant did not subjectively believe defense counsel had mounted a complete defense or was otherwise representing his best interests. He points to his assertions that defense counsel was not communicating with him, and defense counsel's statement that appellant argued with him "on everything," as further evidence that their relationship had devolved into an irreconcilable conflict.

13.

We are not persuaded.  Appellant's claimed lack of trust in or inability to get along with defense counsel was insufficient to show an irreconcilable conflict.  (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070, overruled on another ground by *People v. Hill* (1998) 17 Cal.4th 800; see *People v. Silva* (1988) 45 Cal.3d 604, 622 [defendant's belief counsel was not acting in his best interests was insufficient to warrant substitution].)  If such claims " ' "were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment … which is certainly not the law." ' "  (*People v. Memro* (1995) 11 Cal.4th 786, 857.)  As the trial court observed, appellant undoubtedly had "strong feelings" about the outcome of the first phase of the trial.  But his frustrations with defense counsel's performance and disagreements over tactical decisions was not enough to warrant substitution, particularly given the court's reasonable finding that defense counsel provided competent representation.

Additionally, the trial court was not obligated to accept appellant's allegations that defense counsel made no effort to communicate with him.  Defense counsel denied these allegations and repeatedly maintained he conferred with appellant throughout the proceedings.  The court also oversaw the entire trial and was able to observe the interactions between appellant and defense counsel.  Based on its observations and the representations of defense counsel, the court was entitled to conclude appellant's complaints were unfounded.  (See *People v. Smith* (1993) 6 Cal.4th 684, 697 [court entitled to make credibility determination and accept counsel's explanation]; *People v. Taylor, supra,* 48 Cal.4th at p. 600 [same].)  Although the court did not make an express credibility finding, its denial of the *Marsden* motion clearly implied that it did not credit appellant's allegations.

Appellant relies on two federal cases, *U.S. v. Williams* and *U.S. v. Walker*, which both held the trial court erred in denying motions to substitute appointed counsel where the defendant made a prima facie showing of an irreconcilable conflict.  (*U.S. v. Williams* (9th Cir. 1979) 594 F.2d 1258, 1261; *U.S. v. Walker* (9th Cir. 1990) 915 F.2d 480, 485,

overruled on another ground by *U.S. v. Nordby* (9th Cir. 2000) 225 F.3d 1053, 1059.)

However, in both cases, the trial court made no effort to ascertain the nature and extent of

the conflict between the defendant and counsel that was brought to its attention. (*U.S. v.*

*Williams, supra,* at pp. 1259–1260; *U.S. v. Walker, supra,* at p. 483.) Here, in contrast,

the court gave appellant every opportunity to express his grievances, then made detailed

inquiries into defense counsel's alleged deficiencies and failure to communicate. This

allowed the court to ascertain whether the relationship between appellant and defense

counsel had so deteriorated that defense counsel would not be able to provide effective

representation throughout the remaining proceedings.

To conclude, the trial court denied the *Marsden* motion after conducting a

thorough hearing and observing defense counsel's performance and interactions with

appellant throughout the first phase of the trial. Having reviewed the record in its

entirety, we conclude the court's ruling was reasonable. Appellant has not shown his

right to assistance of counsel was substantially impaired or that an irreconcilable conflict

occurred. (See *People v. Taylor, supra,* 48 Cal.4th at p. 599.) Accordingly, the court did

not abuse its discretion, and this claim lacks merit.

## II. The Jury's Gang Allegation Finding on Count 3 Was Supported by Substantial Evidence.

Following the bifurcated phase of the trial on the gang allegations (§ 186.22

subd. (b)(1)), the jury found the allegation true as to count 3, possession of a loaded,

unregistered firearm (§ 25850, subds. (a), (c)(6)), but was unable to reach a verdict as to

the allegations on counts 1 and 2. Appellant contends the jury's finding on count 3 was

not supported by sufficient evidence. Specifically, he alleges the prosecution evidence

did not establish a "common benefit [that] is more than reputational." (§ 186.22,

subd. (g).)

15.

### A. Applicable law.

The gang allegation under section 186.22, subdivision (b)(1), requires the prosecution prove the defendant committed the associated offense "for the benefit of, at the direction of, or in association with a criminal street gang." Here, the jury specifically found appellant committed count 3 "for the benefit of a criminal street gang."[3]

The term "benefit" means "to provide a common benefit to members of a gang where the common benefit is more than reputational." (§ 186.22 subd (g).) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Ibid.*)

Expert opinion "can be sufficient to raise the inference that the conduct was 'committed for the benefit of … a[] criminal street gang.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 63; see *People v. Vang* (2011) 52 Cal.4th 1038, 1048.) Circumstantial evidence can also support such a finding. (*People v. Cooper* (2023) 14 Cal.5th 735, 745, fn. 9.)

### B. Standard of review.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see *People v. Albillar, supra,* 51 Cal.4th at pp. 60–61 [applying substantial evidence standard to gang allegation].) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be

---

[3] The jury was not instructed on, nor asked to determine, whether appellant acted at "the direction of, or in association with a criminal street gang."

convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)

### C. *Substantial evidence supported the jury's finding.*

We conclude substantial evidence supported the jury's finding that appellant committed count 3 for the common benefit to his gang that was "more than reputational." (§ 186.22, subd. (g).) The evidence showed appellant was an active member of the EB gang with prominent gang tattoos on his face. He walked through the territory of the VWS gang carrying a loaded firearm. The People's gang expert opined that appellant possessed the firearm for the benefit of the EB gang because it was available for offensive and defensive purposes. It can be used to commit violent assaults against rival gang members, or to deter or defend against such attacks.

Appellant's interaction with Munoz highlighted these benefits. Munoz's prominent VWS gang tattoos, and his presence in VWS gang territory, gave appellant reason to believe Munoz was a rival gang member. Upon seeing Munoz, appellant called out "Bakers," the name of his own gang, then displayed his firearm. This is consistent with "banging," which the gang expert described as a challenge and an act of disrespect, typically done to a perceived rival. Based on this evidence, the jury could reasonably infer that appellant possessed the firearm to confront rival gang members in a manner likely to result in violence. In other words, appellant possessed the firearm to "[target] a perceived or actual gang rival," a statutorily recognized common benefit under section 186.22, subdivision (g).

Appellant contends the evidence only established he possessed the firearm for personal protection. He notes that he was with his girlfriend, not other gang members, and that both he and Munoz belonged to Sureño gangs. In his view, the confrontation with Munoz "was the result of the egos of the men involved and their desire to preserve their own reputations." This argument ignores the compelling evidence that appellant

17.

acted for a gang purpose. As the prosecution gang expert explained, the EB gang rivals other Sureño gangs, and violence between Sureño gangs is common. Appellant chose to confront Munoz and "bang on" him, indicating he perceived Munoz to be a rival gang member and acted based on that perception. Thus, the jury was justified in concluding appellant possessed the firearm for the purpose of confronting other gang members.

Appellant also argues the prosecution gang expert's characterization of the benefit derived from his possession of the firearm was purely reputational. He interprets the gang expert's testimony as suggesting the only reason appellant had the firearm was to respond to perceived acts of disrespect by rivals to maintain his gang's reputation. But the gang expert's testimony was not limited respect and reputation. Rather, he testified that a firearm is the "most powerful tool for a gang member" because it can be used to commit violent assaults against rival gang members, and to deter and defend against such attacks. As reflected by appellant's own conduct, a gang member can use a firearm to target, injure, or eliminate a perceived rival, providing clear non-reputational benefit to the gang.

Based on our review of the record, the evidence clearly supports the jury's finding that appellant committed count 3 for the benefit of the EB gang in a manner that was more than reputational. Accordingly, we conclude the jury's finding was supported by substantial evidence, and this claim lacks merit.

### III. The Record Does Not Demonstrate the Trial Court Was Unaware of Its Discretion to Impose a Lesser Firearm Enhancement Under *Tirado*.

At appellant's sentencing hearing, the trial court acknowledged it had the discretion to strike the section 12022.53, subdivision (d), use of a firearm enhancement, but it declined to do so. Appellant contends the record shows the court was unaware of its discretion to instead impose a lesser uncharged statutory enhancement under *Tirado*.

#### A. *Background.*

Appellant was sentenced to an indeterminate term of 32 years to life in state prison as follows. On count 1, the charge of willful, deliberate, and premeditated attempted

18.

murder (§§ 664, subd. (a), 187, subd. (a)), the trial court sentenced appellant to an indeterminate term of seven years to life.[4] As to the section 12022.53, subdivision (d) use of a firearm enhancement, the court imposed an additional consecutive term of 25 years to life. Sentences on counts 2 and 3, and the associated enhancements, were stayed pursuant to section 654, subdivision (a).

At the sentencing hearing, prior to the pronouncement of judgment, the trial court stated it was "very familiar" with recent changes to sentencing law, including its discretion to strike "enhancements under section 1385." Later, while imposing sentence, the court again explained it was aware of its discretion to strike the use of a firearm enhancement in the interest of justice pursuant to section 1385, and that it "considered all the case law that discusses that." The court then stated, "[i]n exercising my discretion I do not find it would be in the interest of justice to strike" the use of a firearm enhancement.

## B.     *Senate Bill No. 620 and Tirado*.

Effective January 1, 2018, Senate Bill No. 620 (2017–2018 Reg. Sess.) (Stats. 2017, ch. 682, § 2) amended section 12022.53, subdivision (h) to give trial courts discretion to "strike or dismiss" enhancements imposed under this section "in the interest of justice pursuant to section 1385."

In January 2022, the Supreme Court decided *Tirado*, holding that section 12022.53, as amended by Senate Bill No. 620, "permits a court to strike [a] section 12022.53[, subdivision] (d) enhancement found true by the jury and to impose a lesser uncharged statutory enhancement instead." (*Tirado, supra,* 12 Cal.5th at p. 692.) Thus, under *Tirado*, a trial court may either strike a section 12022.53, subdivision (d),

---

**4**     Willful, deliberate, and premeditated attempted murder is punishable by imprisonment for life with the possibility of parole. (§ 664, subd. (a).) Section 3046 requires a defend sentenced to life in person to serve at least seven years before becoming eligible for release on parole. (§ 3046, subd. (a)(1); see *People v. Jefferson* (1999) 21 Cal.4th 86, 97.)

enhancement outright, or impose a lesser uncharged enhancement under section 12022.53, subdivision (c), or section 12022.53, subdivision (b).

**C.      *Standard of Review.***

Sentencing decisions are subject to the abuse of discretion standard.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; *People v. Hicks* (2017) 17 Cal.App.5th 496, 512.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  Thus, "[a]n abuse of discretion occurs when the trial court … is unaware of its discretion." (*In re White* (2020) 9 Cal.5th 455, 470.)  However, "[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*Gutierrez,* at p. 1390; see *People v. Myers* (1999) 69 Cal.App.4th 305, 310 ["The court is presumed to have considered all of the relevant factors"].)

The burden is on the party attacking the sentence to demonstrate an abuse of discretion occurred.  (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.) "To meet this burden, the [appellant] must 'affirmatively demonstrate that the trial court misunderstood its sentencing discretion.' " (*People v. Lee* (2017) 16 Cal.App.5th 861, 866.)

**D.      *Appellant fails to show the trial court was unaware of its sentencing discretion.***

Appellant contends the record suggests the trial court was unaware of its discretion under *Tirado* because it only stated on the record it was declining to strike the section 12022.53, subdivision (d), firearm enhancement.  According to appellant, the court's failure to expressly state that it had discretion under *Tirado* to impose a lesser enhancement shows it was unaware of that discretion.

Appellant's argument is premised on an incorrect standard of review. As we explained above, the burden is on appellant to " 'affirmatively demonstrate that the trial court misunderstood its sentencing discretion.' " (*People v. Lee, supra,* 16 Cal.App.5th at p. 866.) Moreover, "[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez, supra,* 58 Cal.4th at p. 1390.) Here, nothing in the record suggests the trial court was unaware of its discretion under *Tirado*. The court's statement that it was declining to strike the firearm enhancement does not affirmatively demonstrate it was unaware of its discretion to impose a lesser enhancement.

We are also persuaded by the trial court's statements that it was familiar with recent changes to sentencing law, including case law related to the court's discretion to strike enhancements pursuant to section 1385. The sentencing hearing occurred in August 2023, over one and a half years after *Tirado* was decided. We have no reason to believe the court was only referring to Senate Bill No. 620, which had been in effect for over five years at the time of sentencing, and was a statutory amendment, rather than new caselaw. Thus, the record affirmatively demonstrates the court *was aware* of its discretion under *Tirado*, and it did not abuse its discretion in sentencing appellant.

## DISPOSITION

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:


FRANSON, J.


SMITH, J.

21.